IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs May 14, 2003

## STATE OF TENNESSEE v. JOHNNY D. ROBERTS

**Appeal from the Criminal Court for Davidson County**
**No. 2001-C-1812     Cheryl Blackburn, Judge**

---

**No. M2002-02996-CCA-R3-CD - Filed July 30, 2003**

---

The defendant, Johnny D. Roberts, was convicted by a Davidson County Criminal Court jury of aggravated rape and aggravated sexual battery. The trial court merged the defendant's convictions into one conviction for aggravated rape and sentenced him as a Range I, violent offender to twenty-five years in the Department of Correction. The defendant appeals, claiming that (1) the evidence is insufficient to support his convictions, (2) the trial court erroneously admitted into evidence a tape recording and transcript of the victim's 9-1-1 telephone call to the police, (3) the trial court erred by failing to declare a mistrial after the prosecutor commented on the defendant's failure to testify, and (4) the trial court erred by refusing to apply a mitigating factor in sentencing him. We affirm the judgment of conviction.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOSEPH M. TIPTON, J., delivered the opinion of the court, in which DAVID H. WELLES and ALAN E. GLENN, JJ., joined.

Ross E. Alderman, District Public Defender; Jeffrey A. DeVasher, Assistant Public Defender (on appeal); and Laura Dykes, Deputy Public Defender (at trial), for the appellant, Johnny D. Roberts.

Paul G. Summers, Attorney General and Reporter; Elizabeth B. Marney, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Bret Thomas Gunn, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

This case relates to the defendant's attacking the victim in the early morning hours of July 28, 2001. The victim testified that she bought a condominium on July 25 and was moving boxes into it on the night of July 27. She said she arrived at the condo about 10:00 p.m. and started to leave about 1:00 a.m. on July 28. She said she went from her condo into the adjoining garage where her car was parked and began to raise the garage door manually. She said that when the bottom of the garage door was about eye level, she saw the defendant, whom she did not know, standing outside.

She said the defendant raised the door the rest of the way. She said that she asked if she could help him but that he told her to shut up. She said that she told him to leave but that he entered the garage. She said he came toward her, pulled down her shorts, and inserted what felt like his fingers into her vagina. She said that as she tried to get away, they fell to the floor with the defendant on top of her. She said that she screamed at him to leave but that he kept telling her to shut up. She said she bit his cheek and ear, scratched him, and kicked him in the chest. She said the defendant bled on her clothes and on the garage floor. She said he then got up and ran away.

The victim testified that she took the defendant's hat and necklace, which he had left behind, and locked them inside her condo to prevent him from getting them back. She said that she drove to a Walgreen's in order to telephone the police because she did not have a telephone in her condo. She said that Walgreen's was only about one-half mile away and that she called the police within five minutes of the attack. She waited at Walgreen's for the police, and officers arrived a few minutes later. The victim returned to her condo with the police officers, and the officers collected her clothes and took photographs of her, her clothes, and the area. She gave a statement to a detective in the Sex Abuse Unit and had burn marks from the concrete on her elbows and ankles, scratches on her back, a busted lip, and other bruises. She said she was beaten up and felt as if something had been put into her vagina. She said she did not go to the hospital for a medical exam at that time because her attacker only used his hand and there was no semen to obtain. She said that on July 31, she identified the defendant as her attacker from a photograph array. A few days later, she went to Dr. Barbara Kent, her personal physician. She said she told Dr. Kent that she was worried about contracting an infection or a disease from her attacker and that she had experienced vaginal irritation and discharge since the attack. On cross-examination, the victim testified that the defendant was not wearing a disguise and did not try to cover his face. She acknowledged that he was not wearing gloves and did not have a weapon. She also said he did not hit, kick, or choke her during the attack. She acknowledged that in an earlier statement, she had said the defendant pulled her shorts down and penetrated her vagina after they had fallen onto the garage floor.

Officer Michael Gooch of the Nashville Metropolitan Police Department (Metro Police) testified that he responded to a report of a woman screaming on the morning of July 28, 2001. He and another officer went to Walgreen's and saw the victim, who was upset and had been crying. He went to the victim's condominium, secured the crime scene, and requested a K-9 unit, which started searching the area for the attacker. He said a detective from the Sex Abuse Unit arrived and questioned the victim. Officer Gooch wrote the incident report in this case. On cross-examination, he said that according to his report, officers that arrived after him were dispatched to the Walgreen's to investigate an attempted rape.

Detective Marsha Brown of the Metro Police testified that in July 2001, she worked in the Sex Abuse Unit. She said that she took the victim's statement and told the victim about possible medical treatment for her injuries but that the victim declined to go to the hospital. She sent blood collected at the scene, the victim's clothing and fingernail scrapings, and a sample of the defendant's blood to the Tennessee Bureau of Investigation Crime Laboratory. On cross-examination, she said

that it was important to perform a medical exam as soon as possible after an attack and that she explained the importance of an exam to the victim.

Metro Police Officer George Bouton of the Identification Division testified that he took photographs and collected fingerprints and a blood sample from the driveway. On cross-examination, he testified that he did not find any blood in the garage and that he listed the crime as an attempted rape based on the information he had, although he did not speak with the victim.

Dr. Barbara Kent testified that she is a licensed physician in Tennessee and that the victim is her patient. The victim came to her office on August 2, 2001, complaining of vaginal discharge and possible exposure to disease during an attack that had happened a few days earlier. She examined the victim and found nothing unusual, except the victim's complaint of discharge. She said that the insertion of a finger could have caused the discharge but there was no reason to treat it. On cross-examination, she testified that she was not able to determine if the victim's discharge was more or less than normal but that a pap smear did show vaginal irritation.

Detective Tom Jones testified that he saw the defendant after the defendant was arrested. He said the defendant had scratches on his face and elbow and a cut on his right ear.

Constance Howard, an expert in serology and DNA analysis, testified that the blood on the victim's clothing matched the defendant's DNA profile. She said the statistical probability of an unrelated, Caucasian individual having the same profile was 1 in 4.8 quadrillion. She was not able to determine anything from the blood collected in the driveway or from the victim's fingernail scrapings. Based upon the evidence, the jury convicted the defendant of aggravated rape and aggravated sexual battery.

## I. SUFFICIENCY OF THE EVIDENCE

The defendant contends that the evidence is insufficient to support his convictions. He argues that the state failed to prove the element of sexual penetration required for aggravated rape and the element of sexual contact required for aggravated sexual battery. The state contends that the evidence is sufficient. We agree with the state.

Our standard of review when the defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). We do not reweigh the evidence but presume that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions about witness credibility were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

In order to prove the essential elements of aggravated rape as alleged in the indictment, the state had to prove beyond a reasonable doubt that the defendant unlawfully sexually penetrated the victim and caused bodily injury. See Tenn. Code Ann. § 39-13-502(a)(2). "Sexual penetration" is defined as an "intrusion, however slight, of any part of a person's body . . . into the genital or anal openings of the victim's, the defendant's, or any other person's body." Tenn. Code Ann. § 39-13-501(7). "Bodily injury" is defined as "a cut, abrasion, bruise, burn or disfigurement; physical pain or temporary illness or impairment of the function of a bodily member, organ, or mental faculty." Tenn. Code Ann. § 39-11-106(a)(2).

To establish the offense of aggravated sexual battery as charged in the indictment, the state had to prove that "there was unlawful sexual contact with a victim by the defendant" and that "the defendant caused bodily injury to the victim." Tenn. Code Ann. § 39-13-504(a)(2). "Sexual contact" includes the "intentional touching of the victim's, the defendant's, or any other person's intimate parts, or the intentional touching of the clothing covering the immediate area of the victim's, the defendant's, or any other person's intimate parts, if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification." Tenn. Code Ann. § 39-13-501(6). "'Intimate parts' includes the primary genital area, groin, inner thigh, buttock or breast of a human being." Tenn. Code Ann. § 39-13-501(2).

Viewed in the light most favorable to the state, the evidence shows that the defendant is guilty of aggravated rape and aggravated sexual battery. The victim's uncontroverted testimony is that the defendant entered her garage against her will and penetrated her vagina with his fingers. The victim also testified that she suffered various injuries during the crimes in question such as burn marks, scratches, and a busted lip. She said that she fought the defendant and that he bled on her clothes. Officer Bouton testified that he saw the victim's injuries and photographed them. Additionally, Constance Howard, an expert in serology and DNA analysis, testified that the blood on the victim's clothing matched the defendant's DNA profile and that the probability of someone else having the same profile was extremely remote. Dr. Barbara Kent testified that the victim came to her a few days after the attack and complained of vaginal discharge subsequent to the attack. Dr. Kent also said that the insertion of fingers could have caused the discharge. Detective Tom Jones testified that the defendant had injuries to his face, elbow, and ear. These injuries are consistent with the victim's testimony that she bit the defendant on his cheek and ear.

In challenging the sufficiency of the evidence for the aggravated rape conviction, the defendant points to inconsistencies between the victim's testimony and her statement to the police. The victim's testimony at trial was that the defendant penetrated her vagina before they fell to the floor, while her statement to the police was that penetration occurred after they had fallen to the floor. The defendant claims that the victim altered her trial testimony because it was nearly impossible for penetration to occur while they struggled on the floor. On cross-examination, the victim testified that her police statement on the morning of the attack was slightly incorrect because of her troubled state of mind when she wrote it. We note that the jury heard this testimony and knew the discrepancies between the victim's statement and her testimony at trial, yet determined that the

defendant was guilty. The weight and value to be given to the evidence are resolved by the trier of fact, not this court. State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987).

Regarding the defendant's aggravated sexual battery conviction, he contends that the state did not prove the element of sexual contact. Specifically, he claims that the evidence does not show that the contact was for the purpose of sexual arousal or gratification because the defendant made no sexual remarks to the victim and because "[there] is no evidence that the defendant fondled, massaged, rubbed, or otherwise manipulated his hands in a sexual manner when he allegedly touched the victim." However, the fact that the defendant struggled with the victim, pulled down her shorts, and inserted his fingers into her vagina belies the defendant's claim. The evidence was sufficient for the jury to find beyond a reasonable doubt that the defendant inserted his fingers into the victim for the purpose of sexual arousal or gratification.

## II. ADMISSIBILITY OF THE 9-1-1 TAPE

The defendant contends that the trial court erred in admitting into evidence a tape recording and transcript of the victim's telephone call to the police. The state contends that the trial court properly admitted the evidence. We agree with the state.

At trial, the prosecutor sought to introduce into evidence a tape recording of the victim's 9-1-1 call in which the victim told the police that a man had just attacked and "fingered" her. The prosecutor argued that the tape was an excited utterance and, therefore, admissible as an exception to the hearsay rule. The defendant objected, contending that the tape was being offered to corroborate the victim's testimony, which had not been attacked; that the prosecutor did not lay the proper foundation; and that the excited utterance exception to the hearsay rule did not apply. The trial court allowed the prosecutor to recall the victim in order to lay the proper foundation for the introduction of the tape and then admitted the tape and its written transcript into evidence.

Three requirements must be met for a hearsay statement to be admissible as an excited utterance: (1) there must be a startling event or condition; (2) the statement must relate to the startling event or condition; and (3) the statement must be made while the declarant is under the stress or excitement from the event or condition. Tenn. R. Evid. 803(2); State v. Gordon, 952 S.W.2d 817, 820 (Tenn. 1997). The "ultimate test" for determining the admissibility of an excited utterance is "spontaneity and logical relation to the main event and where an act or declaration springs out of the transaction while the parties are still laboring under the excitement and strain of the circumstances and at a time so near it as to preclude the idea of deliberation and fabrication." State v. Smith, 857 S.W.2d 1, 9 (Tenn. 1993). Other relevant considerations include: (1) the time interval between the startling event and the statement; (2) the nature and seriousness of the condition; (3) the appearance, behavior, outlook, and the circumstances of the declarant, including characteristics such as age, physical condition, and mental condition; and (4) the contents of the statement, which may indicate the presence or absence of stress. Gordon, 952 S.W.2d at 820. The rationale behind the excited utterance exception is that the hearsay statement is reliable because it is made when time for reflection and possible fabrication are lacking and memory of the event is still

fresh in the declarant's mind. Id. at 819-20 (citing Neil P. Cohen et al., Tennessee Law of Evidence, §803(2).1, at 532 (3d ed. 1995)).

The defendant does not contest the first two requirements, but does contend that the victim was no longer under stress or excitement when making the statement. In support of his argument, the defendant points to the fact that after the crimes in question, the victim unlocked her door, placed the defendant's hat and necklace inside her condo, locked the door again, and drove to a Walgreen's to call the police. However, the victim testified that she telephoned the police within five minutes of being attacked. Moreover, we have listened to the 9-1-1 tape and, although the victim sounded calm at first, she began crying during the call. We note that the fact that a measure of calm returns to the declarant does not prevent the application of Tenn. R. Evid. 803(2). See, e.g., State v. Smith, 868 S.W.2d 561, 574 (Tenn. 1993). We conclude that it was reasonable for the trial court to hold that the victim was operating under stress or excitement at the time of the 9-1-1 call and that the trial court properly admitted the tape and transcript into evidence.

## III. CLOSING ARGUMENT

The defendant contends that the prosecutor improperly commented on the defendant's decision not to testify and that the trial court should have *sua sponte* granted a mistrial. The state contends that because the defendant did not request a mistrial, the issue is waived and that, in any event, the trial court's curative instruction was sufficient to safeguard the defendant from the comment's prejudicial effect, if any. We agree with the state.

In his closing argument, the prosecutor stated, "Now, let's talk about what [the victim] did say, because she's the only one that gave a version of what happened. She's the person who told you what happened." The defendant objected, arguing that the prosecutor had commented on the defendant's right not to testify, and the trial court responded with the following curative instruction:

> All right. Ladies and gentlemen, you are to disregard the last remarks
> of counsel. Again, counsel's statements are not evidence and are
> intended just to assist you. The defendant is not required to testify
> and you can make no inference from that fact.

Under the Fifth Amendment, argument regarding the defendant's failure to testify is improper. Griffin v. California, 380 U.S. 609, 615, 85 S. Ct. 1229, 1233 (1965). However, prosecutorial misconduct does not constitute reversible error unless the outcome was affected to the defendant's prejudice. State v. Bane, 57 S.W.3d 411, 425 (Tenn. 2001). In Judge v. State, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976), this court set out the following considerations for determining whether the state's conduct or argument could have prejudiced the defendant and affected the verdict:

> 1. The conduct complained of viewed in context and in light of the
> facts and circumstances of the case.

2. The curative measures undertaken by the court and the prosecution.

3. The intent of the prosecutor in making the improper statement.

4. The cumulative effect of the improper conduct and any other errors in the record.

5. The relative strength or weakness of the case.

See also State v. Buck, 670 S.W.2d 600, 609 (Tenn. 1984) (approving these factors in determining if the misconduct resulted in reversible error).

Although we acknowledge the reasonableness of the inference that the defendant draws from the prosecutor's comment, we hesitate to say that the prosecutor intended that inference. In any event, the trial court's curative instruction was sufficient to correct any possible prejudice that resulted from the statement. The jury's compliance with the instruction by the trial court is presumed. State v. Vanzant, 659 S.W.2d 816 (Tenn. Crim. App. 1983); Frazier v. State, 566 S.W.2d 545 (Tenn. Crim. App. 1977). We conclude that the comment did not affect the verdict and does not require reversal.

The defendant also claims that the prosecutor's statement shifted the burden of proof to the defense. We disagree. During its instruction to the jury, the trial court stated that the "state has the burden of proving the guilt of the defendant beyond a reasonable doubt, and this burden never shifts but remains on the state throughout the trial of the case." In light of this instruction, the prosecutor's comment did not shift the burden of proof in this case. The defendant is not entitled to relief.

### IV. SENTENCING

Finally, the defendant contends that his twenty-five-year sentence is excessive because the trial court failed to consider an applicable mitigating factor regarding his conduct not causing or threatening serious bodily injury. The state claims that the trial court properly sentenced the defendant. We conclude that the defendant's twenty-five-year sentence is proper.

Appellate review of sentencing is de novo on the record with a presumption that the trial court's determinations are correct. Tenn. Code Ann. §§ 40-35-401(d) and -402(d). As the Sentencing Commission Comments to these sections note, the burden is now on the appealing party to show that the sentence is improper. This means that if the trial court followed the statutory sentencing procedure, made findings of fact that are adequately supported in the record, and gave due consideration and proper weight to the factors and principles that are relevant to sentencing under the 1989 Sentencing Act, we may not disturb the sentence even if a different result were preferred. State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

However, "the presumption of correctness which accompanies the trial court's action is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). In this respect, for the purpose of meaningful appellate review,

> the trial court must place on the record its reasons for arriving at the final sentencing decision, identify the mitigating and enhancement factors found, state the specific facts supporting each enhancement factor found, and articulate how the mitigation and enhancement factors have been evaluated and balanced in determining the sentence.

State v. Jones, 883 S.W.2d 597, 599 (Tenn. 1994).

Also, in conducting a de novo review, we must consider (1) the evidence, if any, received at the trial and sentencing hearing, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct, (5) any mitigating or statutory enhancement factors, (6) any statement that the defendant made on his own behalf, and (7) the potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-102, -103, -210; see Ashby, 823 S.W.2d at 168; State v. Moss, 727 S.W.2d 229 (Tenn. 1986).

The sentence to be imposed by the trial court for a Class A felony is presumptively the midpoint in the range when there are no enhancement or mitigating factors present. Tenn. Code Ann. § 40-35-210(c). Procedurally, the trial court is to increase the sentence within the range based upon the existence of enhancement factors and then reduce the sentence as appropriate for any mitigating factors. Tenn. Code Ann. § 40-35-210(d), (e). The weight to be afforded an existing factor is left to the trial court's discretion so long as it complies with the purposes and principles of the 1989 Sentencing Act and its findings are adequately supported by the record. Tenn. Code Ann. § 40-35-210, Sentencing Commission Comments; Moss, 727 S.W.2d at 237; see Ashby, 823 S.W.2d at 169.

No witnesses testified at the sentencing hearing, but a presentence report was admitted into evidence. According to the report, the defendant has prior convictions for attempted rape, indecent exposure, assault, burglary, and many other offenses. The report reflects that the defendant committed some of these offenses while he was on probation and that his probation has been revoked three times. The trial court found enhancement factor (1), that the defendant has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range, and factor (8), that the defendant has a previous history of unwillingness to comply with the conditions of a sentence involving release in the community, applied to his

sentence. See Tenn. Code Ann. § 40-35-114(1), (8) (Supp. 2001) (amended 2002).[1] The trial court stated that factor (1) was entitled to great weight.

The defendant argued that the trial court should apply mitigating factor (1), that his conduct neither caused nor threatened serious bodily injury. See Tenn. Code Ann. § 40-35-113(1). The trial court determined that although the defendant did not cause serious bodily injury, the threat of serious bodily injury existed because the victim had resisted the attack. Thus, the trial court held that no mitigating factors applied and sentenced the defendant to twenty-five years, the maximum punishment in the range.

On appeal, the defendant does not challenge the applicability of the enhancement factors but claims that mitigating factor (1) applies to his sentence. We disagree. Tenn. Code Ann. § 39-11-106(34) states that serious bodily injury involves

> (A) A substantial risk of death;
> (B) Protracted unconsciousness;
> (C) Extreme physical pain;
> (D) Protracted or obvious disfigurement; or
> (E) Protracted loss or substantial impairment of a function of a bodily
> member, organ or mental faculty.

Psychological problems can constitute serious bodily injury. State v. Smith, 910 S.W.2d 457, 461 (Tenn. Crim. App. 1995).

The defendant notes that the victim's injuries were not serious and that the record does not indicate that he, by words or actions, ever threatened serious bodily injury. However, the defendant penetrated the victim by use of force and physical violence. The victim's resistance could have resulted in more serious injuries, but the defendant bears the brunt of the threat of such injuries by his use of violence. We acknowledge that the defendant ended the attack, but we do not believe that the evidence preponderates against the trial court's findings regarding this factor. In any event, we believe the presence of the two enhancement factors and the significant weight they deserve justify the imposition of the twenty-five-year sentence.

Based on the foregoing and the record as a whole, we affirm the judgment of conviction.

_____
JOSEPH M. TIPTON, JUDGE

---

[1] The legislature's 2002 amendment to Tenn. Code Ann. §40-35-114 added as the new enhancement factor (1) that the "offense was an act of terrorism" but changed the existing enhancement factors only in increasing their designating number by one. Thus, former enhancement factor (1) is now enhancement factor (2) and factor (8) is now factor (9).